OPINION
Defendant-appellant, Daniel Carnes, appeals his conviction in the Clermont County Court of Common Pleas for murder and tampering with evidence. We affirm appellant's conviction.
The conviction stems from an incident that took place in the early morning hours of April 9, 2000 in the trailer home of appellant's parents. Both the state and appellant agree that between the hours of 1:00 a.m. and 7:00 a.m., appellant, who was seventeen years old at the time of the incident, fatally shot his friend, Jacob Gilligan, in the head with a .22 caliber rifle. The state successfully argued at trial that the shooting was purposeful, while appellant claimed the shooting was accidental.
On April 8, 2000, appellant's girlfriend, Brandy Sullivan, picked up appellant at Arby's, where he was employed. Other acquaintances of appellant had also gathered there. Because appellant's parents were on vacation, appellant, Brandy, and others made plans to meet at appellant's trailer later that night. After briefly stopping at Brandy's house, appellant, Brandy, and another friend, Justin Valens, went to appellant's cousin's apartment where appellant, his cousin, and Justin smoked marijuana. At some point, appellant and Brandy decided to leave for appellant's trailer. First, they followed Justin home because he was worried about his ability to drive. On the way to Justin's house, they stopped while Justin and appellant smoked more marijuana.
Appellant and Brandy then proceeded to appellant's trailer. On the way, appellant and Brandy picked up the victim, Jacob, whom appellant described at trial as his best friend. While en route to appellant's trailer, they saw some of the people who had planned to meet them, traveling in the other direction. However, they were unable to get their attention. Appellant, Brandy, and Jacob arrived at appellant's trailer about midnight.
At appellant's trailer, appellant and Jacob smoked marijuana, drank beer, talked, and listened to music. Brandy stayed until about 1:00 a.m., and then left for home. At about 7:00 a.m., Brandy received a call from appellant, who told her to come to the trailer. When Brandy arrived, she found appellant, who was conscious but incoherent, lying in blood on the kitchen floor. Brandy then found Jacob slumped over on the living room couch, bleeding from his head. She attempted to revive Jacob, but was unsuccessful. She then called 911. When paramedics arrived at the scene, they found Jacob dead. Appellant was transported to the hospital and treated for minor injuries.
Appellant gave several different accounts to police investigators as to how Jacob was killed. First, appellant claimed that a man named Danny Casino was involved in Jacob's death. He claimed that Casino came to appellant's trailer to sell Jacob LSD, and then shot Jacob and beat appellant. After police investigators determined that Casino had a strong alibi, appellant admitted that this account was false. He then implicated two young men named Ricky and Rob in Jacob's death and his own beating. Appellant later admitted that this account was also false, and provided a third version as to what happened that night.
In his third version, appellant claimed that, as he was carrying his father's .22 caliber rifle to the living room from a rear bedroom, he bumped the kitchen counter and the gun discharged. Appellant admitted that his own injuries were self-inflicted due to despair over the loss of his friend. He also stated that he fabricated his earlier accounts because he did not want anyone to think he had caused his friend's death. Appellant's defense counsel was present throughout these discussions with police investigators.
On April 18, 2000, a complaint was filed against appellant in Clermont County Juvenile Court alleging that appellant was a delinquent child and had purposely caused the death of another in violation of R.C. 2903.02(A). The juvenile court held a bind over hearing to determine whether there was probable cause to believe that appellant purposely caused Jacob's death. At the hearing, two witnesses testified: appellant's girlfriend, Brandy, and Michael Henderson, a Miami Township Police Department detective.
Brandy testified that she was awakened by appellant's phone call about 7:00 a.m. Appellant told her to come over because Jacob needed help, and that her nursing course might be helpful. He told her not to speed and to "come over safe." He also said that he was "in a lot of trouble." Brandy further testified that, when she arrived, she found appellant lying in blood in the kitchen, and Jacob slumped over and bleeding from the head on the couch in the living room. She thought she heard appellant tell her, "Go get them," but she did not understand what he meant. She attempted to revive Jacob by giving him chest compressions, but was unsuccessful. Thinking Jacob was dead, she called 911. She saw many beer bottles on the coffee table in the living room, but no signs of an argument or struggle.
Detective Henderson testified that he found a gun cabinet in the rear bedroom, which contained a .22 caliber rifle. He also recovered a cartridge casing on the carpet in the living room, which was of the type that would be recovered if someone had fired the .22 caliber rifle. Detective Henderson then testified about the three different versions appellant gave for what occurred on the night in question.
Detective Henderson testified in detail as to appellant's third account. Appellant stated that he and Jacob had been talking about guns, and that appellant decided to shoot his father's .410 shotgun. However, appellant thought the .410 shotgun might make too loud of a noise, so he decided to load his father's .22 caliber rifle instead. He was not extremely familiar with that weapon, but was eventually able to load it. According to Detective Henderson, appellant stated that, as he was carrying the rifle from the rear bedroom to the kitchen, he bumped the kitchen counter and the gun discharged. According to appellant, Jacob was sitting on the couch in the living room, which is adjacent to the kitchen, leaning over to pick up a beer from the coffee table. Detective Henderson testified that appellant was clear in stating that his finger was not on the trigger when the gun discharged. Appellant also admitted to Detective Henderson that he inflicted injuries upon himself because he was so upset over what had happened.
Detective Henderson further testified that, when he found Jacob on the couch, he was wearing a blue zip-up sweatshirt and a leather jacket. Brandy had testified that when she left appellant's trailer at 1:00 a.m., Jacob had taken off his jacket and was wearing a white tee shirt. The jacket and sweatshirt covered abrasions found on Jacob's upper left arm and shoulder.
In the prosecutor's closing argument at the probable cause hearing, the prosecutor referred to the coroner's autopsy report. The prosecutor stated that the report showed superficial abrasions on the left arm and upper left shoulder, which were consistent with gunshot stippling. The coroner's report also showed that, when Jacob's left arm is raised vertically above the head, the superficial abrasions are immediately to the left of the gunshot wound to Jacob's head. The prosecutor then argued that the abrasions and their alignment with the head wound indicated a defensive action taken by Jacob to protect himself from the gunfire.
At the conclusion of the bind over hearing, the juvenile court found probable cause to believe that appellant purposely caused Jacob's death. As required by law, the case was then transferred to the general division of the common pleas court for prosecution as an adult. Appellant was indicted for one count of murder in violation of R.C. 2903.02(A) with a firearm specification, and one count of tampering with evidence in violation of R.C. 2921.12(A)(1).
A jury trial was held in November 2000, at which the state presented numerous witnesses. Brandy testified in similar detail to her testimony at the probable cause hearing. Several police detectives and investigators testified as to the three different versions appellant gave regarding what happened on the night of the shooting. William Schrand, a senior firearms examiner at the Hamilton County Coroner's crime laboratory, testified that he was unable to make the .22 caliber rifle discharge by repeatedly hitting it with a mallet and ramming it into a rubber pad. Dr. Gary Utz, a deputy coroner at the Hamilton County Coroner's office, testified that the abrasions on Jacob's left arm and shoulder were consistent with gunshot stippling, and that the abrasions lined up with the head wound when the left arm was raised vertically over the head. The state again argued that this alignment indicated a defensive action by Jacob in response to appellant pointing the rifle at him.
The jury also heard testimony from three of appellant's former high school teachers, who testified that appellant had told them he thought he was capable of killing someone, and that he would like to kill someone. One teacher also testified that appellant stood up in front of the class during the 1998-99 school year and stated that the Columbine killers were heroes. Appellant's trial counsel objected to the admission of some of this testimony. The testimony of appellant's former teachers was admitted only for consideration as to the absence of accident and appellant's intent in causing Jacob's death.
Appellant's sketchbook, as well as photographs of graffiti on appellant's bedroom wall, were also admitted for the limited purpose of showing the absence of accident and appellant's intent. The sketchbook and the graffiti included some violent language such as "Tonight we murder," "I will murder this whole goddamn planet you mother fuckers," and "Armed and Dangerous," but was mostly comprised of less violent drawings, symbols, and song lyrics related to punk rock bands.
Appellant took the stand in his own defense and repeated his third account of the night of Jacob's shooting. However, he testified that he could not recall whether his finger was on the trigger at the time the gun discharged. He testified that he fabricated the earlier accounts because he panicked and did not want people to think he had caused his best friend's death.
The jury convicted appellant of murder with a firearm specification, and tampering with evidence. The trial court sentenced appellant to prison terms of fifteen years to life for murder, three additional years for the firearm specification, and five years for tampering with evidence, the sentences to be served consecutively. Appellant now appeals, raising two assignments of error.
Assignment of Error No. 1:
 THE JUVENILE COURT ERRED WHEN IT FOUND PROBABLE CAUSE THAT THE APPELLANT COMMITTED THE OFFENSE OF MURDER.
In his first assignment of error, appellant argues that the evidence the state presented before the juvenile court was not sufficient to establish probable cause to believe that appellant purposely killed Jacob. Therefore, appellant contends, it was improper for the juvenile court to have transferred jurisdiction to the general division of the common pleas court for prosecution as an adult.
In matters pertaining to children who are alleged to be delinquent, the juvenile court has exclusive jurisdiction. R.C. 2151.23(A)(1); State v.Wilson (1995), 73 Ohio St.3d 40, 43. However, in certain situations, the mandatory bind over provisions of R.C. 2151.26(B) require the juvenile court to transfer a case to the general division of the common pleas court for prosecution as an adult. State v. Iacona (2001),93 Ohio St.3d 83, 90. One such mandatory bind over situation arises when a juvenile court finds probable cause to believe that a juvenile sixteen years of age or older has committed a "category one offense," such as purposeful murder. R.C. 2151.26(B)(3)(a).
When the juvenile court conducts a preliminary hearing to determine whether there is probable cause to believe that a juvenile has committed a "category one" offense, the state is not required to establish the juvenile's guilt beyond a reasonable doubt. State v. Ruggles (Sept. 11, 2000), Clinton App. No. CA99-09-027, unreported, at 5-6. Rather, the state only must establish "probable cause to believe" that the juvenile has committed the charged act. See R.C. 2151.26(B); Juv.R. 30(A) and (B). Accordingly, the state must provide credible evidence of every element of an offense to support a probable cause finding. Iacona at 93.
First, we address the state's contention that probable cause to believe appellant committed murder existed solely based on appellant's use of a deadly weapon. According to the state, an inference of intent to kill can simply be drawn from appellant's use of a deadly weapon. In support of this argument, the state cites State v. Coley (2001), 93 Ohio St.3d 253. However, that case is inapposite. Coley dealt with R.C. 2903.01, Ohio's aggravated murder provision. The language at issue in that case has since been amended. Prior to the amending of the provision, R.C.2903.01(E) allowed juries to infer intent to kill based on the use of a deadly weapon during the commission of a felony, which, due to the manner in which it was carried out, would likely produce death. This case involves neither the commission of a separate felony likely to produce death nor R.C. 2903.01.
Nevertheless, we find sufficient evidence supporting the juvenile court's finding of "probable cause to believe" that appellant purposely killed Jacob. First, Brandy's testimony as to her phone conversation with appellant seemed to indicate that Jacob's death was a purposeful killing and not an accident, as appellant claimed. For example, appellant told her to "come over safe," and that he was "in a lot of trouble."
Second, and more indicative of probable cause, was Detective Henderson's testimony. He testified as to the three very different accounts appellant gave for what happened that night, which also seemed to indicate that appellant did not accidentally kill Jacob, but did so purposely. After first implicating three other individuals in Jacob's killing, appellant finally told Detective Henderson that he was holding the rifle when it discharged.
The coroner's report also supports the juvenile court's finding of probable cause. The juvenile court could infer from the coroner's report that the abrasions on Jacob's arm and shoulder likely indicated a defensive action by Jacob. As the coroner's report states, the abrasions are consistent with gunshot stippling and line up with the head wound when the left arm is raised vertically above the head. At the very least, the juvenile court could infer that the abrasion wounds were not consistent with appellant's account of how the shooting occurred, placing more doubt on appellant's claim of accident.
Additionally, the fact that Jacob was found wearing a hooded sweatshirt and a leather jacket over the abrasions on his arm indicates that someone, presumably appellant, put these clothes on Jacob after he was shot. This evidence also supports the juvenile court's finding of probable cause that appellant purposely killed Jacob.
The juvenile court was not required to find appellant's guilt of the offense beyond a reasonable doubt, but "probable cause to believe" appellant committed the offense. See R.C. 2151.26(B); Ruggles, Clinton App. No. 99-09-27, unreported, at 5-6. Based on (1) the testimony of Brandy concerning appellant's telephone conversation with her following the shooting; (2) Detective Henderson's testimony regarding appellant's many different versions of what occurred the night of the shooting; (3) Detective Henderson's testimony that appellant stated he was holding the gun when it discharged; (4) the coroner's report describing abrasions on Jacob's left upper arm and shoulder that are consistent with gunshot stippling, and which line up with the head wound when the left arm is raised above the head; and (5) the fact that Jacob was found wearing a sweatshirt and jacket over the abrasions on his shoulder and arm, we find that there was credible evidence before the juvenile court of probable cause to believe appellant purposefully killed Jacob. See Iacona,93 Ohio St.3d at 93. Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN ALLOWING INADMISSIBLE EVIDENCE TO BE PRESENTED TO THE JURY.
In his second assignment of error, appellant argues that the trial court allowed inadmissible character evidence to be admitted at trial. Appellant first argues that the trial court improperly admitted the testimony of appellant's former high school teacher, Bonnie Dunkelman. Ms. Dunkelman testified that appellant said the Columbine killers were heroes, and that he would like to kill someone. Appellant argues that this testimony is inadmissible "other acts" evidence under Evid.R. 404(B), and "fails utterly" to show appellant's intent or the absence of accident in Jacob's death, contrary to the state's contention. Additionally, appellant argues that the trial court violated Evid.R. 404(A) by admitting appellant's sketchbook, as well as photographs of graffiti written on the walls of appellant's bedroom.
It is well-established that the admission and exclusion of evidence rests within the sound discretion of the trial court. State v. Robb
(2000), 88 Ohio St.3d 59, 68. Absent an abuse of discretion, as well as a showing that the accused has suffered material prejudice, an appellate court will not disturb a ruling by a trial court as to the admissibility of evidence. State v. Martin (1985), 19 Ohio St.3d 122, 129. An abuse of discretion connotes more than an error of law or judgment, and implies that the court's attitude is unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
Evid.R. 404(B) states:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Bonnie Dunkelman, appellant's former high school teacher testified that, in April 1999, appellant was upset over his fellow students' dim view of the Columbine shooters. According to Ms. Dunkelman, appellant stood up in class and stated that "the shooters at Columbine High School were heroes." Ms. Dunkelman testified that appellant said the shooters were heroic because they "got rid" of the jocks and preps who picked on them. Ms. Dunkelman also testified that appellant expressed to her on another occasion during the 1998-99 school year that he would like to kill someone. Appellant objected to Ms. Dunkelman's testimony at trial.
Immediately following Ms. Dunkelman's testimony, the trial judge gave a limiting instruction, advising the jury that it could not consider the testimony as proof of defendant's character in order to show that he acted in conformity with that character on the night of the shooting. The trial judge told the jury that it could consider the evidence only as to whether it proved the absence of accident and appellant's intent in causing Jacob's death. Additionally, when the trial judge gave the jury its final instructions prior to deliberation, the trial judge repeated this limiting instruction as to evidence of prior conduct and statements of appellant.
We do not find an abuse of discretion by the trial court in admitting Ms. Dunkelman's testimony under Evid.R. 404. In accordance with Evid.R. 404(B), Ms. Dunkelman's testimony was not admitted for the purpose of proving that appellant acted in conformity with those statements when he killed Jacob. Rather, it was admitted only for consideration as to the absence of accident and appellant's intent in killing Jacob. The trial judge gave the jury a limiting instruction to ensure that the testimony would only be considered for this purpose. Thus, the trial court did not violate Evid.R. 404 by admitting Ms. Dunkelman's testimony.
The trial court also did not abuse its discretion in admitting appellant's sketchbook and the graffiti photographs. Though appellant argues this issue under Evid.R. 404(A), we find the evidence admissible under 404(B). Appellant purchased the sketchbook for an art class during the 1998-99 school year. The sketchbook mostly contained drawings, symbols, and song lyrics relating to punk rock bands. The last page of the sketchbook included, among other things, the words, "Tonight we murder," and, "I will murder this whole goddamn planet you mother fuckers." This page also contained language such as "Everyone hates me," "I hate myself and I want to die," "I can't kill me," "Fuck you," "Latasha Marie Robinson sucks," and "I hate the bitch." The record shows that Latasha Marie Robinson was a previous girlfriend of appellant. The graffiti included drawings, symbols, and lyrics relating to punk rock bands, and also some violent language such as, "Armed and Dangerous."
The sketchbook and the graffiti photographs were admitted for the limited purpose of disproving appellant's claim that he accidentally killed Jacob. The trial judge gave a limiting instruction that the jury could only consider the evidence as to the absence of accident. Thus, we find that the admission of this evidence was proper under Evid.R. 404(B).
Based on the foregoing analysis, appellant's second assignment of error is overruled.
Judgment affirmed.
VALEN, P.J., and POWELL, J., concur.